UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

**SHARIF MOHAMED and AIDEN MOHAMED,**

**Plaintiffs,**

**-v-**                    **1:13-CV-428 (NAM/CFH)**

**TOWN OF NORTH GREENBUSH,**

**Defendant.**

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

APPEARANCES:

Frost & Kavanaugh, P.C.
Arthur R. Frost, Esq., of counsel
287 North Greenbush Road
Troy, New York 12180
Attorney for Plaintiffs

Burke, Scolamiero, Mortati and Hurd, L.L.P.
Thomas J. Mortati, Esq., of counsel
7 Washington Square
Albany, New York 12212
Attorney for Defendant

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

In this action, removed to this Court from New York State Supreme Court, County of

Rensselaer, plaintiffs assert claims under 42 U.S.C. § 1983 ("section 1983") as well as New York

State constitutional and common-law claims stemming from a law-enforcement stop of a vehicle

operated by plaintiff Sharif Mohamed in which his son plaintiff Aiden Mohamed was a passenger.

Plaintiffs claim, *inter alia*, that the wrongs against them resulted from the policies and customs of

defendant municipality in failing properly to train and supervise its police officers.

Defendant moves (Dkt. No. 22) for summary judgment dismissing the complaint. Plaintiffs withdraw their claim for punitive damages. As explained below, the Court grants the motion for summary judgment in all respects; dismisses Sharif Mohamed's New York State common-law malicious prosecution claim without prejudice; and dismisses all other claims with prejudice.

## COMPLAINT

The complaint (Dkt. No. 1), verified by Sharif Mohamed, alleges the following. At 7:23 p.m. on September 11, 2011 in the Town of North Greenbush, New York ("Town"), plaintiff Sharif Mohamed was operating a motor vehicle in which plaintiff Aiden Mohamed was a passenger. Town Police Officer Slagen ("Officer Slagen"), who was operating a marked Town police vehicle in the course of his duties, effected a stop of Sharif Mohamed's vehicle and an arrest of Sharif Mohamed. Officer Slagen issued traffic tickets to Sharif Mohamed accusing him of violations of New York Vehicle and Traffic Law ("V&T Law") §§ 375(12-a)(b)(2) (tinted front windows) and 511(1)(a) (operating vehicle while license is suspended or revoked).[1]

Plaintiffs allege that the vehicle's windows were not unlawfully tinted, that Sharif Mohamed's licence was not suspended or revoked, and that Officer Slagen was aware of these

---

[1] V&T Law § 375(12-a)(b)(2) provides:
>  No person shall operate any motor vehicle upon any public highway, road or street ... the sidewings or side windows of which on either side forward of or adjacent to the operator's seat are composed of, covered by or treated with any material which has a light transmittance of less than seventy percent[.]

V&T Law § 511(1)(a) provides:
>  A person is guilty of the offense of aggravated unlicensed operation of a motor vehicle in the third degree when such person operates a motor vehicle upon a public highway while knowing or having reason to know that such person's license or privilege of operating such motor vehicle in this state or privilege of obtaining a license to operate such motor vehicle issued by the commissioner is suspended, revoked or otherwise withdrawn by the commissioner.

facts when he stopped the vehicle. The complaint states:

> 14. The offense for allegedly violating [V&T Law § 375(12-a)(b)(2)] is invalid insofar as Plaintiff Sharif Mohamed's vehicle's windows were not unlawfully tinted.
>
> 15. Police Officer Slagen was aware that Mr. Mohamed's vehicle's windows were not unlawfully tinted when Police Officer Slagen initiated the traffic stop, when he approached Mr. Mohamed's vehicle, when he detained both Plaintiffs, when he drew his sidearm and pointed it at Plaintiff Sharif Mohamed's head, and when he issued the uniform traffic ticket for same.
>
> 16. The offense for allegedly violating V&T Law § 511(1)(a) is invalid insofar as Plaintiff Sharif Mohamed's license was not suspended or revoked.
>
> 17. Police Officer Slagen was aware that Mr. Mohamed's license was not suspended or revoked when he initiated the traffic stop, when he approached Mr. Mohamed's vehicle, when he detained both Plaintiffs, when he drew his sidearm and pointed it at Plaintiff Sharif Mohamed's head, and when he issued the uniform traffic ticket for same.
>
> 18. This stop and arrest was unlawful, and without any authority under federal and/or New York State law.
>
> 19. During the course of this traffic stop and arrest, Police Officer Slagen unholstered and pointed his firearm at Plaintiff Sharif Mohamed.
>
> 20. While Police Officer Slagen pointed his firearm at Plaintiff Sharif Mohamed, Plaintiff Aiden Mohamed was seated approximately two feet from Plaintiff Sharif Mohamed, and thus in the line of fire of Police Officer Slagen's firearm.
>
> 21. Neither Plaintiff Sharif Mohamed nor Plaintiff Aiden Mohamed did anything to justify or provoke Police Officer Slagen's actions.

The first cause of action on behalf of Sharif Mohamed and the second cause of action on behalf of Aiden Mohamed allege that Officer Slagen wrongfully arrested and detained them in violation of their state and federal constitutional and civil rights. These two causes of action add allegations in support of municipal liability based on the Town's failure to supervise and train its police officers. The third cause of action on behalf of Sharif Mohamed and the fourth on behalf of Aiden Mohamed sound in false imprisonment. The fifth cause of action on behalf of Sharif Mohamed alleges malicious prosecution based on the V&T Law charges against him. The sixth cause of action on behalf of Sharif Mohamed and the seventh on behalf of Aiden Mohamed allege

that the Town was negligent in hiring and training its police officers including Officer Slagen, and that this negligence caused legally insufficient charges to be filed against Sharif Mohamed, thereby causing Sharif Mohamed's detention, arrest and prosecution, and Aiden Mohamed's detention. Plaintiffs seek compensatory damages. They have withdrawn the eighth and ninth causes of action for punitive damages.

## THE MOTION

A party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the burden shifts to the non-movant to adduce evidence establishing the existence of an issue of material fact. *See Linares v. McLaughlin*, 423 Fed.Appx. 84, 86 (2d Cir. 2011). If the non-movant fails to make such a showing, the movant is entitled to summary judgment. When deciding a summary judgment motion, the court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citation omitted). Conclusory statements or mere allegations, however, are not sufficient to defeat a summary judgment motion. *Id.* To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In moving for summary judgment in the instant case, defendant argues that Officer Slagen's conduct in stopping Sharif Mohamed's car, approaching it with a drawn weapon, and detaining Sharif Mohamed in his vehicle for approximately five minutes until the incident was resolved was supported by probable cause and therefore was reasonable as a matter of law under the Fourth Amendment and state law. Defendant also argues that, as a matter of law, Officer Slagen's conduct in ticketing Sharif Mohamed for excessively tinted windows and driving with a suspended license did not amount to malicious prosecution. Finally, defendant argues that plaintiffs have failed to present any evidence that Officer Slagen's allegedly wrongful conduct is chargeable to the Town, because plaintiffs present no evidence that the Town maintained a policy or custom of failing to train and/or supervise its employee police officers.

Plaintiffs agree that the "Use of Force" policy set forth in defendant's Administrative Procedure manual is constitutional. They argue that Officer Slagen applied it in an unconstitutional manner, that his improper application of the policy resulted from the Town's inadequate training and/or supervision, and that the inadequate training and/or supervision caused the wrongs allegedly suffered by plaintiffs.

**FACTS**

Neither Sharif Mohamed nor Aiden Mohamed submits an affidavit, nor were they deposed. The only admissible factual evidence given directly by either plaintiff is found in the complaint, quoted above, which was verified by Sharif Mohamed.

In support of the motion, the Town submits the affidavit of Officer Slagen, who had been with the Town Police Department since 2005. He states that on September 11. 2011, while on patrol in a marked Town police vehicle, he pulled alongside the vehicle operated by Sharif

Mohamed and observed that it was equipped with tinted side windows.  He continues:[2]

> 7. Based upon my knowledge, training and experience as a police officer, as well as the lack of transparency, it was my belief that the tinting was excessive, and in violation of Section 375(12-a)(b)(2) of the New York Vehicle and Traffic Laws. ...
>
> 8. Having found probable cause to do so, I proceeded to initiate a traffic stop at or around the intersection of Whiteview Road and Winter Street Extension, by turning on my emergency lights.
>
> 9. Mr. Mohammad pulled his vehicle on to the side of the road and stopped.
>
> 10. My patrol car was equipped with a dashboard camera which was used to record video and audio of the entire traffic stop.
>
> ***
>
> 12.  Upon exiting my patrol car, I was unable to see inside Mr. Mohammad's vehicle, as the windows were heavily tinted and rolled up. I then observed a rocking motion and/or movement of the vehicle and could not see what the occupants of the vehicle were doing.
>
> 13. Having observed this motion and/or movement and unable to see inside the vehicle, I immediately became concerned for my safety.
>
> 14. As a police officer employed by the Town of North Greenbush Police Department, I have received training regarding appropriate use of force under the circumstances; specifically, when an officer may draw or display a service weapon.
>
> 15. Based upon my knowledge, training, and experience, an officer may display their service weapon when there is reason to believe such may be necessary for the safety of the officer.
>
> 16. Under the circumstances described above, having been fearful of the unknown and concerned for my safety, I drew and displayed my service weapon and proceeded to approach the vehicle.
>
> 17. As I was nearing the driver side door, I observed that the window was now partially rolled down. At this point however, I was only able to see the driver, Mr. Mohamed, and that there was at least one other occupant seated in the front passenger seat.
>
> 18. Still concerned for my safety and fearful of unknown dangers, I continued to display my service weapon.
>
> 19. With my service weapon pointed at the center mass of the driver's side compartment, I made a verbal command to Mr. Mohamed requesting his driver's license and registration.
>
> 20. When I finally reached the driver's side door, I observed that the driver's window was now completely rolled down.  All of the vehicle's other windows

---

[2]  In quoting from this affidavit the Court does not note or correct occasional misspellings of plaintiffs' last name.

remained up.

21. Upon observing Mr. Mohammad's hands and looking at his face, I recognize[d] him from past dealings and no longer feared for my safety. At this point, I immediately holstered my service weapon.

22. From the time I drew and displayed my service weapon, approximately twenty-one (21) seconds elapsed before it was holstered as based on my review of the dash camera video for the stop.

23. Soon thereafter, Officer John Jurs of the Town of North Greenbush Police Department arrived at the scene. Windows other than driver window were up. Officer Jurs proceeded to the passenger side of the vehicle.

24. After obtaining Mr. Mohammad's driver's license and registration, I proceeded to contact dispatch to verify the information and current status of Mr. Mohammad's license.

25. I provided the information to Dispatcher Demars. Dispatcher Demars indicated that Mr. Mohammad had one suspension, one scoff, zero on zero dates.

26. Upon receipt of this information and based upon my knowledge, training, and experience as a police officer, I concluded that Mr. Mohammad was in violation of Section 511(1)(a) of the New York State Vehicle and Traffic Laws, Aggravated Unlicensed Operation of a Motor Vehicle in the 3rd Degree. Specifically, the statute indicates that a person is guilty of this offense "when such person operates a motor vehicle upon a public highway while knowing or having reason to know that such person's license or privilege of operating such motor vehicle in this state or privilege of obtaining a license to operate a motor vehicle issued by the commissioner is suspended, revoked, or otherwise withdrawn by the commissioner."

27. In accordance with the initial stop of Mr. Mohammad's vehicle and the investigation that ensued as a result, I prepared and issued Uniform Traffic tickets to Mr. Mohammad for violating Sections 375(12-a)(b)(2) (Side Windows Non-Transparent) and 511(1)(a) (Aggravated Unlicensed Operation of a Motor Vehicle in the 3rd Degree ) of the New York State Vehicle and Traffic Laws.

During his deposition, Officer Slagen testified:[3]

Q. What was the reason you drew your weapon?
A. It was officer safety . I couldn't see inside the vehicle, and I could see that there was motion from the vehicle as if there was movement inside the vehicle. It was rocking, if you will. That's the best term I could say.
***
Q. Officer Jurs at some point joined you during this traffic stop, right?

---

[3] When quoting from deposition transcripts, the Court omits all form objections.

A. Correct.

Q. Officer Jurs approached the vehicle from the passenger side; is that fair?

A. Correct.

Q. Coming from behind it.

A. Correct.

Q. Would you agree that the window tint on the rear window was the same as the window tint on the windows you observed on the driver's side of the vehicle?

***

A. I don't know if they were the same. I just know they were very dark.

Q. Are you qualifying your answer because you didn't actually test the windows?

A. Correct.

Q. By the naked eye, did they appear to have the same level of tint?

A. Yes. It did.

Q. ... Would the same be true from the passenger side?

A. I don't believe I ever stood on the passenger side.

Q. You saw the passenger side as Mr. Mohamed turned from Bloomingrove on to Winter Street Extension, right?

A. Correct.

Q. I know you only had a second to look, but did the window tint appear to be the same from the naked eye?

A. It did.

***

Q . As you approached the vehicle from your patrol vehicle were you able to see any motion inside the vehicle?

A. Not motion inside the vehicle. I could see the vehicle in motion as if there was movement from inside the vehicle.

Officer Slagen testified that the window tint was the only reason he decided to stop the vehicle. Asked whether a tint meter (a hand-held device that measures the light transmittance of a car window) was available to him, he stated that he did not know, because although the Town had one that could be used on that type of window, he believed it was missing at the time of the stop. During the deposition, plaintiffs' counsel played the video of the traffic stop. Officer Slagen acknowledged that the "rocking" movement of the vehicle was not evident on the video.

Regarding his approach to the vehicle after drawing his weapon, Officer Slagen testified:

Q. When you approached the driver's side window, you demanded Mr.

Mohamed's driver's license and registration, right?

A. Correct.

Q. And at this point your pistol was still drawn.

A. I believe so. Yes.

***

A. The driver's side window initially only came down part way. So I point through the window so I can see his head above the window. So I'm pointed through the window.

***

Q. When was it, if ever, that the driver's side window went down all the way?

A. I believe when I got all the way up to the driver's side.

Q. When you got all the way up to the driver's side, you observed Mr. Mohamed driving – well, in the driver's seat.

A. Correct .

***

Q. When you approached the driver's side window, saw Mr. Mohamed and saw Aiden Mohamed, at that point the rear windows were still up; is that fair?

A. Correct.

Q. On both sides.

A. Yes.

Q. And the passenger side window was still up; is that fair?

A. Correct.

Q. It was only after Officer Jurs joined you and then a few seconds had elapsed that all the windows on the vehicle were down; is that fair?

A. Correct.

Q. There came a point when you holstered your weapon, right?

A. Yes.

***

Q. When you saw Mr. Mohamed's hands, that's when you holstered your weapon; is that fair?

A. Correct.

Q. At this point, when you put your weapon away, you still couldn't see if there was anybody else in the vehicle beyond Aiden Mohamed, true?

A. That's correct.

Q. And that's because the other windows were still up.

A. Yes.

***

Q. Wouldn't the danger that could have been in the backseat still have been present until the windows went down?

A. Could have. Yes.

Q. Did anything occur prior to all the windows going down, prior to your verifying that there was no one in the backseat prepared to do you harm, that alleviated your fear?

A . Yes.

> Q. What?
> A. It was Sharif Mohamed. As soon as I saw his hands, I looked at his face, because I'm watching for hands. And when I saw it was Sharif Mohamed, I was no longer in fear for my life.
> Q. Do you know Mr. Mohamed?
> A. Yes.
> Q. Did you know him prior to September 11th?
> A. Yes .
> Q. And simply because you now knew who it was you were no longer afraid. Is that a fair statement?
> A. Correct.

It is undisputed that the dispatcher told Officer Slagen that Sharif Mohamed's driver's license was suspended. Officer Slagen acknowledged that in fact it was not suspended at the time of the incident and that the dispatcher was "simply wrong."

Officer Slagen was questioned extensively regarding his training, particularly regarding the use of force and the display of a weapon. Asked about the Town Police Department's Administrative Procedure, he testified:

> Q. And that indicates that you can draw a firearm as applies here when you have reason to believe that such force may be necessary for the safety of the officer or others, right?
> A. Yes.
> Q. That was your rationale for drawing your weapon on September 11th; is that fair?
> A. Yes.
> Q. What alternative did you consider and reject prior to drawing your weapon on September 11th?
> A. I don't believe I considered and rejected any alternatives prior to that.

Officer Slagen agreed that the Town Police Department policy was to use the least amount of force that is appropriate under the circumstances. Asked about alternatives to drawing his weapon that he could have considered, he stated that he "could have used the PA system to announce to the driver to roll all the windows down." He also stated:

> A. I could have called for backup cars.

-10-

> Q. Did you consider that alternative?
> A. There were no backup cars available at that time when I made the stop.
> Q. How did you know that?
> A. Because I recall that Officer Jurs was on another incident and Sergeant Croll was leaving a meal break to go handle an EMS call. Those were the only other two cars that were working with me that day.
> Q. So, are you telling me that you considered and rejected that alternative?
> A. I didn't consider it because I knew they weren't available.

Plaintiffs' attorney then suggested other alternatives such as unstrapping the weapon without unholstering it or drawing the weapon but pointing it at the ground; Officer Slagen stated he did not consider them. Plaintiffs' counsel questioned Officer Slagen about his interepretation of concepts such as "high risk traffic stop" and "deadly force." Counsel also questioned him about precisely when the driver's side window was rolled all the way down.

Plaintiffs also deposed Officer Jurs. He stated that drawing a firearm and pointing it at someone was a use of force but not a use of deadly force; that under the Town Police Department policy, a police officer could draw and display a weapon for officer safety or to protect others; that under the policy a police officer may not resort to force unless all other reasonable alternatives have been exhausted or would not be effective; and that under the policy an officer can use no more force than that which is reasonably necessary. When viewing the video of the subject incident, Officer Jurs testified that it appeared from the reflection in the driver's side mirror that the driver's side window went down while Officer Slagen was still behind Sharif Mohamed's vehicle.

Asked about alternative actions that Officer Slagen could have taken under the circumstances, Officer Jurs agreed that he could have retreated to his vehicle and called for backup, used the PA system to direct the driver to roll down the window and put his hands out, unstrapped the holster, or unholstered the weapon and pointed it down. He testified that under the

same circumstances, he would not have drawn his firearm and pointed it at the occupant of the

vehicle.  He testified:

> Q.  What would you have done?
> A. I would have retreated to my vehicle, taken a safe location, and waited for backup.
> Q. What about the other alternatives that we discussed, unsnapping the weapon, pulling the weapon but pointing it down, using the PA system, would you have considered any of those alternatives?
> A. I would consider – the PA system would have been second part of retreating back to the vehicle, using the PA system. But sometimes the PA system doesn't always work right because of the heavy traffic or time of the day. The driver doesn't always hear your commands. Sometimes it's garbled.
> Q. How about pointing the weapon down, would you have considered that?
> A. It's hard for me to get into his mind and what he was thinking at the time.

Officer Jurs testified that by the time he had arrived at the scene, Officer Slagen had holstered his

weapon.  Regarding the tint on the windows, he stated:

> Q. As you sit here now, do you recall how tinted the windows were?
> A. As I sit here today, I remember they were tinted, but I don't remember the exact transparencies as far as light going through.

Regarding the tint meter, Officer Jurs stated that not every Town police officer carried one;

rather, the Police Department only had one available, and at any given time it could be in another

vehicle or at the police station. He further testified:

> Q. ... When you approached the passenger side of the vehicle, all the windows except the driver's side window were up; is that right?
> ***
> A. And I believe, to the best of my recollection, the passenger side window was up.  When I shined my light into it, the window got rolled down. Like I said, it's very foggy as far as my memory goes.

Plaintiffs also rely on the  "Summary of Investigative Actions and Findings" ("Summary

of Investigation") issued by Chief (then Captain) Robert Durivage ("Chief Durivage"), who was

assigned by the Town Police Department to conduct an administrative review of a citizen

complaint filed by Sharif Mohamed regarding the September 11, 2011 incident. According to the Summary of Investigation, Sharif Mohamed told Chief Durivage that he was "upset that a gun was pointed at him and his son" and that "his license was not suspended and he should not have been issued that ticket." The Summary of Investigation includes the following speculative hearsay observation: "As far as Mr. Mohamed knows, the vehicle which was a 2003 Lincoln SUV came from the factory with the tinted windows and he or his wife (Erin Mohamed, the registered owner) never had the windows tinted."

Chief Durivage's Summary of Investigation noted:

> In accordance to Administrative Procedure 20, Use of Force, Officers may draw or display firearms under the following circumstances – An officer shall unholster or display a firearm only if directed by a competent authority, or there is reason to believe such may be necessary for the safety of the officer or others. Examples where this may occur but are not limited to are high risk traffic stops, building searches, etc. Officers may use the force reasonably necessary, such as to conduct an investigative stop without converting the stop into an arrest.

The Summary of Investigation continued:

> After a careful review of departmental policies and procedures with regards to "Use of Force" it can be supported that Officer Slagen did not use unnecessary force. Although, Officer Slagen could have used other alternatives in getting the motorist to roll down the windows of the motor vehicle in order for Officer Slagen to have a visual of the interior compartment. Furthermore, his actions in advancing to the vehicle stopped without proper back up and without utilizing other verbal commands and protocols put himself in more danger than was necessary.

> Since no policy can realistically predict every possible situation an officer might encounter in the field, it is recognized that each officer must be entrusted with well-reasoned discretion in determining the appropriate use of force in each incident. While it is the ultimate objective of every law enforcement encounter to minimize injury to everyone involved, nothing in this policy requires an officer to actually sustain or unreasonably risk physical injury before applying reasonable force to effect arrest, overcome resistance or prevent escape.

-13-

Additionally, Officer Slagen should have verified the percentage of tint to the driver's side window using a departmental tint meter.

The Summary of Investigation concluded: "Based upon my investigation of this incident, I conclude the disposition of this complaint as: ... Improper Conduct / Action." His recommendation was: "Use of Department Equipment/High Risk Traffic Stop Training (to include Investigative Stops) / review with all relevant policy & procedures."

On this motion, Chief Durivage submits an affidavit that includes the following:

8. Based upon my experience, knowledge, and training in law enforcement, and in accordance with Administrative Procedure 20, it is well recognized and permitted to unholster or display a firearm during a traffic stop encounter; however, the force used must be "reasonable under all the circumstances."
***
12. Upon objective review of the facts and circumstances, and based upon my experience, knowledge, and training in law enforcement, Officer Slagen's observation of excessively tinted windows on Mr. Mohamed's vehicle amounted to probable cause to initiate the traffic stop.

13. Based upon my objective review of all of the facts and circumstances surrounding the traffic stop of Mr. Mohamed, as well as careful consideration of the Department's policies and procedures, I found Officer Slagen was in reasonable fear for his safety given the unknown. As such, he acted reasonably under the circumstances and did not use unnecessary force by unholstering and displaying his service weapon while approaching Mr. Mohamed's vehicle. Based on my review of the dash board camera video of the subject traffic stop, Officer Slagen unholstered his service weapon and displayed it for approximately 20 seconds before determining the situation was under control at which time he holstered his weapon and completed the traffic stop that resulted in citations issued.

14. As noted in the Summary of Investigative Actions and Findings, although there were alternative options available to Officer Slagen as in most any circumstance officers can encounter, every possible situation an officer might encounter in the field cannot be realistically predicted nor how the events might progress. That is why each officer is trained and entrusted with reasoned discretion in determining the appropriate use of force in each incident.

15. Based upon my experience, knowledge, and training in law enforcement, and in accordance with Administrative Procedure 20, there is no requirement that an officer actually sustain or unreasonably risk injury before applying reasonable force to affect an arrest, overcome resistance, or prevent escape.

16. Based upon my experience, knowledge, and training in law enforcement, as well as my objective review of all of the facts and circumstances surrounding the traffic stop of Mr. Mohamed, and in accordance with Administrative Procedure 20, Officer Slagen effectuated the stop with probable cause, acted reasonably under the circumstances thereafter, and did not use unnecessary or excessive force.

(Citations to record omitted.)

## DISCUSSION

### Fourth Amendment – Vehicle Stop

The Fourth Amendment of the United States Constitution protects citizens against unreasonable seizure of their persons. As the Second Circuit explains:

> "The Fourth Amendment permits brief investigative stops – such as the traffic stop in this case – when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity'" or a traffic violation. *Navarette v. California*, __ U.S.__, __, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)); *see also United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) ("[R]easonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop."). While the reasonable suspicion standard requires " 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause," *Navarette*, __ U.S. at __, 134 S.Ct. at 1687 (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)), it does entail "some minimal level of objective justification," *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted). This objective inquiry disregards the officer's subjective motivation and asks instead whether a reasonable officer would suspect unlawful activity under the totality of the circumstances. *Id.* at 132-33; *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing").

*United States v. Diaz*, 802 F.3d 234, 238-39 (2d Cir. 2015). "[R]easonable suspicion 'need not rule out the possibility of innocent conduct.'" *Navarette*, __ U.S. at __, 134 S. Ct. at 1691

-15-

(quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)).  "[A] mistake of fact does not undermine the existence of reasonable suspicion." *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009) (citation omitted).  A vehicle stop is justified where "an 'objectively reasonable' police officer would have suspected the windows were tinted in violation of § 375(12-a)(b) of the Vehicle & Traffic Law." *United States v. Harrell*, 268 F.3d 141, 149 (2d Cir. 2001).

Officer Slagen testified that, based on his training and experience, he believed that the driver's side and front passenger side windows were excessively tinted in violation of V&T Law § 375(12-a)(b)(2).  That this belief had an objective basis is supported by Officer Slagen's testimony that when he approached the vehicle, he could not see through the windows to observe what was happening inside, and that as soon as the driver opened the driver's-side window, he could see that it was Sharif Mohamed, whom he knew, whereupon he immediately holstered his weapon.  It is also supported by the testimony of Officer Jurs that, upon arriving at the scene, he went to the passenger side of the vehicle; that he had the opportunity to observe the tint on the windows; and that he remembers the windows were tinted, although he does not remember "the exact transparencies as far as light going through."[4]

Plaintiffs do not dispute that the windows were tinted; rather, their position is that the degree of tint was lawful.  The only evidence in admissible form from plaintiffs regarding the tint is found in the verified complaint, which sets forth the following conclusory statement: "The offense for allegedly violating [V&T Law § 375(12-a)(b)(2)] is invalid insofar as Plaintiff Sharif

---

[4] Officer Jurs' Supplemental Report, written on the day of the incident, states that upon arriving at the scene: "I approached the vehicle... and observed very dark window tint and all the windows rolled up on the passenger side.  I was unable to see inside other than a silhouette moving on the passenger side."  The report is not sworn, although during his deposition, he identified it as the report that he prepared, and a portion of it was used to refresh his recollection.

-16-

Mohamed's vehicle's windows were not unlawfully tinted." Apart from Officer Slagen's testimony that the tint was so heavy that it prevented him from seeing into the vehicle, there is no admissible non-conclusory evidence regarding the degree of the tint.[5] On this record, inasmuch as it is undisputed that the windows were tinted, the question of whether the degree of tint in fact constituted a violation goes only to whether Officer Slagen was mistaken; it does not raise a question of fact in the face of his sworn statement that, based on his training and experience, he believed the tint constituted a violation. Plaintiffs raise no material question of fact on the issue. On this record, no rational jury could conclude that an objectively reasonable officer would not have believed the windows were excessively tinted in violation of V&T Law § 375(12-a)(b)(2).

Under the totality of the circumstances, defendant has demonstrated that it is entitled to summary judgment dismissing all Fourth Amendment claims based on the stop of the vehicle, because the undisputed evidence establishes that Officer Slagen had a particularized and objective

---

[5] In support of their argument that the stop was improper, plaintiffs point to Chief Durivage's statement in his Summary of Investigation that Officer Slagen "should have verified the percentage of tint to the driver's side window using a departmental tint meter." There is no indication that a tint meter can be used while the subject vehicle is in motion; thus, it does not appear that Officer Slagen could have used the tint meter in determining whether to stop the vehicle. In any event, an objectively reasonable belief or suspicion of a violation is all that is required for a vehicle stop; thus, the fact that Officer Slagen did not test the window with a tint meter is immaterial to the question of whether Officer Slagen properly stopped the vehicle. *See Djangmah v. Falcione*, 2013 WL 208914, at *11 (S.D.N.Y. Jan. 18, 2013) ("Although there is no indication that Falcione tested the windows with a tint meter to determine if they were, in fact, in violation of the law, this failure is immaterial, as only an objectively reasonable belief or suspicion of a violation, supported by articulable facts, is required." (internal quotation marks omitted)), *report and recommendation adopted*, 2013 WL 1195261 (S.D.N.Y. Mar. 25, 2013); *accord United States v. Garcia*, 279 F.Supp.2d 294, 299 (S.D.N.Y. Aug. 27, 2003). Plaintiffs would have the Court infer that the Town did not later seek to inspect the vehicle to test the tint because "the Defendant knows that the windows were not excessively tinted and pulled Mr. Mohamed over for purely pretextural [*sic*] reasons." The Court declines to draw such an inference. Indeed, to the extent that evidence of the actual degree of tint may be relevant, plaintiffs possessed the vehicle after the incident and could easily have obtained such evidence. Further, there is nothing in the record to suggest that Officer Slagen's stated reason for stopping the vehicle was a pretext; in any event, his subjective motivation for stopping the vehicle is irrelevant. *See United States v. Diaz*, 802 F.3d 234, 239 (2d Cir. 2015).

-17-

basis for suspecting legal wrongdoing. Plaintiffs raise no material question of fact. Accordingly, as a matter of law, the stop of Sharif Mohamed's vehicle did not violate plaintiffs' Fourth Amendment protection against unreasonable seizure.

For the same reasons, plaintiffs' New York State law claims based on the traffic stop lack merit. *See People v. Guthrie*, 25 N.Y.3d 130, 133-34, 30 N.E.3d 880, 883 (2015), *reargument denied*, 25 N.Y.3d 1191, 37 N.E.3d 108 (2015) (upholding vehicle stop under federal and state constitution where police officer had objectively reasonable belief that driver committed traffic violation, regardless of whether officer made mistake of fact or law).

**Fourth Amendment – Drawn Weapon**

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842 (2005). Thus, this Court turns to consider whether Officer Slagen's act of approaching the vehicle with his weapon drawn and pointing it towards the driver infringed plaintiffs' Fourth Amendment rights.

In general, traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]." *Berkemer v. McCarty*, 468 U.S. 420, 439, n. 29, 104 S.Ct. 3138, 3150, n.29, 82 L.Ed.2d 317 (1984); *accord Rodriguez v. United States*, __ U.S. __, __, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015). While the drawing of a weapon during an investigative vehicle stop "is an intrusion that calls for careful scrutiny," it "does not automatically convert a stop into an arrest." *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984). In addressing the display of a weapon in the context of an investigative *Terry* vehicle stop, the Second Circuit has observed:

> There are no hard and fast rules for evaluating the conduct of law enforcement agents conducting investigative stops. A law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, regardless of whether probable cause to arrest exists. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

*United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990) (citations and quotation marks omitted).

Traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983). Courts have long recognized "the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331 (1977); *accord Rodriguez v. United States*, __ U.S. __, __, 135 S. Ct. 1609, 1616, 191 L. Ed. 2d 492 (2015). "The risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a [traffic] ... violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *Arizona v. Johnson*, 555 U.S. 323, 331, 129 S. Ct. 781, 787, 172 L. Ed. 2d 694 (2009) (quoting *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S.Ct. 882, 886 (1997)). For this reason, "[t]he risk of harm to both the police and the occupants [of a stopped vehicle] is minimized ... if the officers routinely exercise unquestioned command of the situation." *Johnson*, 555 U.S. at 330, 129 S.Ct. at 786 (alteration in *Johnson*; internal quotation marks omitted).

In particular, "[w]hen, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially[.]" *United States v. Brown*, 334

F.3d 1161, 1169 (D.C.Cir. 2003) (quoting *United States v. Stanfield*, 109 F.3d 976, 981 (4th Cir. 1997)); *accord United States v. Garcia*, 279 F.Supp.2d 294, 303 (S.D.N.Y. Aug. 27, 2003) ("[T]he danger to the officer is so elevated in the case of a traffic stop involving a car with excessively tinted windows that a real basis to believe that weapons are present should fairly be presumed." (internal quotation marks omitted)); *United States v. Hurt*, 135 F.3d 771 (Table), 1998 WL 77763, at *2 (4th Cir. 1998) ("An inherent danger faced the officers who approached [defendant's] vehicle because of the illegally dark window tinting, which prevented the officers from making reliable observations inside the vehicle.").

Here, Officer Slagen's sworn statement is: "I was unable to see inside Mr. Mohammad's [*sic*] vehicle, as the windows were heavily tinted and rolled up.  I then observed a rocking motion and/or movement of the vehicle and could not see what the occupants of the vehicle were doing." Due to these factors, he was "concerned for his safety and fearful of unknown dangers."  As noted above, the only admissible non-conclusory evidence regarding the degree of tint of the windows is Officer Slagen's sworn statement that they were so dark that he could not see into the vehicle. As for the rocking movement of the vehicle, plaintiffs rely on the video of the stop as evidence that there was no such rocking movement.  The Court has viewed the video and finds it is inconclusive as to whether any such movement occurred.  Plaintiffs did not submit any first-hand evidence – such as affidavits from plaintiffs – that could arguably raise a question of fact as to whether any movement occurred.  Therefore, there is nothing in the record to contradict or raise questions of fact regarding Officer Slagen's sworn statements that the windows were so dark that he could not see inside and that he observed movement of the vehicle.

In opposing summary judgment, plaintiffs argue that, instead of approaching the vehicle

with his weapon drawn and pointed towards the driver, Officer Slagen should have retreated to his vehicle and called for backup, used the PA system to instruct the driver to lower the window and put his hands out, or approached the vehicle with the weapon still in its holster (with strap removed) or pointed at the ground.  The superiority of these options is far from clear. For example, there is evidence from Officer Jurs that the PA system was sometimes garbled or could not be heard by the occupants of a vehicle with the windows closed; having the driver put his hands out of the window would not eliminate danger from passengers in the vehicle, whom Officer Slagen could not see; and leaving his weapon holstered or pointed at the ground would delay Officer Slagen's ability to protect himself.  Backup officers would face the same danger that Officer Slagen faced in approaching the vehicle; moreover, Officer Slagen testified that, when he first pulled the vehicle over, he knew no backup was immediately available.  In considering the reasonableness of Officer Slagen's conduct, the Court notes that it is undisputed that he displayed his weapon for only about 20 seconds, and that as soon as he recognized Sharif Mohamed, whom he knew, he holstered his weapon.

Plaintiffs point out that, in the Summary of Investigation in response to Sharif Mohamed's citizen's complaint, Chief Durivage found "Improper Conduct / Action" and recommended "High Risk Traffic Stop Training."  Read  in the context of the entire Summary of Investigation, Chief Durivage's disposition and recommendation appear to reflect the view that Officer Slagen placed himself in excessive danger, not that he unreasonably infringed plaintiffs' rights.  In any event, neither the Summary of Investigation nor Chief Durivage's affidavit raises a question of fact or supports a finding that Officer Slagen's actions were unreasonable in Fourth Amendment terms.

It is axiomatic that "[a] law enforcement agent, faced with the possibility of danger, has a

right to take reasonable steps to protect himself." *Alexander*, 907 F.2d at 272. Based on the undisputed record facts, the Court finds that Officer Slagen's conduct was reasonable under the Fourth Amendment in view all the circumstances, including the inordinate risk he faced when approaching the stopped vehicle, the increased danger due to his inability to see through the windows, his impression that there was movement in the vehicle, his knowledge that no backup was immediately available, and his need to exercise unquestioned command of the situation to minimize the risk of harm to himself and others. He displayed his weapon only for the very brief time necessary to ascertain that he was not in danger – about 20 seconds.

New York State courts applying New York law recognize that police officers may properly stop a vehicle when they have reasonable suspicion of a traffic infraction; that officers approaching a stopped vehicle face an inordinate danger; that under certain circumstances it may be reasonable for them to approach a stopped vehicle with weapons drawn; and that the presence of a drawn gun does not necessarily transform a stop into an arrest. *See, e.g., People v. Chestnut*, 51 N.Y.2d 14, 21, 409 N.E.2d 958, 962 (1980); *People v. Mendez*, 44 A.D.3d 302, 303, 843 N.Y.S.2d 217, 217 (2007); *People v. Barrett*, 14 A.D.3d 369, 370, 787 N.Y.S.2d 321, 322 (2005); *People v. Alvarez*, 308 A.D.2d 184, 187, 764 N.Y.S.2d 42, 45 (2003); *People v. Bedoya*, 190 A.D.2d 812, 812-13, 593 N.Y.S.2d 858, 859 (1993); *People v. Livigni*, 88 A.D.2d 386, 389, 453 N.Y.S.2d 708, 710 (1982), *aff'd for reasons stated at Appellate Division*, 58 N.Y.2d 894, 447 N.E.2d 78 (1983). As New York's high court stated in the seminal case of *People v. DeBour*, "[i]n evaluating the police action we must consider whether or not it was justified in its inception and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible." 40 N.Y.2d 210, 222, 352 N.E.2d 562, 571 (1976). Here, for the same

reasons as it finds no Fourth Amendment violation, the Court finds that Officer Slagen's brief display of his weapon was reasonably related in scope to the circumstances. Plaintiffs' New York State claims based on this conduct lack merit.

**Malicious Prosecution**

Sharif Mohamed's malicious prosecution claim is based solely on New York common law. The elements of the tort of malicious prosecution are: "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Broughton v. State*, 37 N.Y.2d 451, 457, 335 N.E.2d 310, 314 (1975). "[A]n accused, in order to maintain a cause of action for malicious prosecution, must establish that the state prosecution terminated in his favor." *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980).[6] Sharif Mohamed makes no showing that proceeding against him has terminated; indeed, paragraph 67 of the complaint states: "The Plaintiff's prosecution continues even today." Sharif Mohamed's New York State common-law claim for malicious prosecution has not yet accrued; accordingly, it is dismissed without prejudice.[7]

**False Arrest/False Imprisonment**

Under New York law, a false arrest claim is identical to a false imprisonment claim. *See*

---

[6] The requirement of a favorable termination also applies to a section 1983 claim based on malicious prosecution. *See Singleton*, 632 F.2d at 194-95. In any event, Sharif Mohamed alleges no facts that would support a finding that he was deprived of liberty pursuant to legal process, a necessary element of a section 1983 malicious prosecution claim. *See Singer v. Fulton Co. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995). Thus, to the extent that the complaint may be read to assert a section 1983 claim for malicious prosecution, it is dismissed with prejudice.

[7] Such a claim does not accrue until the date the state criminal proceedings are conclusively terminated in the plaintiff's favor. *Palmer v. City of New York*, 315 F. App'x 350 (2d Cir. 2009) (citing *Murphy v. Lynn*, 53 F.3d 547, 548 (2d Cir.1995)).

*Kilburn v. Vill. of Saranac Lake*, 413 Fed.Appx. 362, 363 (2d Cir. 2011). To establish such a claim under New York common law, a plaintiff must show that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton*, 37 N.Y.2d at 456, 335 N.E.2d at 314. Having found that Officer Slagen's stop of the vehicle and brief display of his weapon were lawful under the circumstances, the Court finds that – to the extent that this objectively reasonable investigatory stop may have constituted a "confinement" – it was privileged. There is no evidence of any other confinement. Plaintiffs' false imprisonment claims lack merit as a matter of law.

**Municipal Liability**

The Town is the sole defendant in this case. Plaintiffs contend that the Town is liable for the actions of Officer Slagen under both state and federal law. The Court disagrees.

Under New York State law, when an employee is acting within the scope of his or her employment, the employer is ordinarily vicariously liable for the employee's torts under a theory of *respondeat superior*, and no claim may proceed against the employer for negligent hiring, retention, supervision or training. *See Eckardt v. City of White Plains*, 87 A.D.3d 1049, 1051, 930 N.Y.S.2d 22, 25 (2011); *Ashley v. City of New York*, 7 A.D.3d 742, 743, 779 N.Y.S.2d 502, 503 (2004). Having found that Officer Slagen's conduct was not tortious under New York State constitutional or common law, the Court necessarily finds no basis to impose vicarious liability on the Town. Therefore, all New York State claims against the Town are dismissed with prejudice; the sole exception is the New York common-law claim of malicious prosecution, which has not yet accrued, and which is therefore dismissed without prejudice.

-24-

Under federal law, an employer is not liable for the actions of its employees or agents under a theory of *respondeat superior*. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611. To hold a municipal entity liable under section 1983 for the actions of its employees, a plaintiff must prove (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right. *Id.* at 694, 98 S.Ct. at 2037, 56 L.Ed.2d 611; *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). There is no cause of action for a municipality's failure to train or supervise its employees or for its maintenance of an improper policy or custom; rather, *Monell* liability arises only where the municipality's failure to train or supervise, or the policies or customs that it has sanctioned, led to an independent constitutional violation. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Thus, where there is no federal constitutional violation, there can be no municipal liability under section 1983. *See id.* Here, the Court has found no merit to plaintiffs' claims that Officer Slagen violated their federal constitutional rights in connection with the incident underlying this action, nor do plaintiffs assert any other federal constitutional violation. Accordingly, there is no basis to impose section 1983 liability on the Town in connection with the incident herein.

Moreover, assuming *arguendo* that Officer Slagen's conduct in drawing his weapon violated plaintiffs' federal constitutional rights, the record would not permit a rational jury to find that such conduct was causally connected to any failure on the part of the Town to train Officer Slagen. Plaintiffs concede that the Town's use of force policy in Administrative Rule 20 is constitutional, but argue that Officer Slagen unconstitutionally applied the policy due to inadequate training. A municipality may be held liable under section 1983 for its failure to train

its employees "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989); *accord Simms v. City of New York*, 480 F.App'x 627, 629 (2d Cir. 2012). The Supreme Court explains:

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program....
>
> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 61-62, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal citations and quotation marks omitted). Accordingly, "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).

Plaintiffs present no evidence upon which a rational jury could find any failure to train that constituted deliberate indifference on the part of defendant. There is no evidence of any other violation similar to the alleged violation here, much less a pattern of such violations. Plaintiffs would have the Court find a history of employees' "mishandling the situation" based on Officer Slagen's testimony regarding his understanding of what constitutes a use of force and the

number of times he had drawn his weapon in the past. There is no basis to find that the previous incidents in which Officer Slagen drew his weapon were in any manner similar to the incident in issue here, or that, as a result of those previous incidents, the Town knew or should have known that its use-of-force training was inadequate to prevent tortious conduct. Moreover, there is no other basis to find that the alleged violation here was caused by the Town's deliberate indifference to use-of-force violations. For example, there is no evidence of a widespread practice of similar violations by other officers; no evidence that supervisors communicated to officers an attitude of indifference to use-of-force violations so as to give the officers a sense of liberty to commit such violations; and no evidence of an incident that is so extreme as to warrant municipal liability in the absence of a pattern of similar constitutional violations. Further, there is no evidence that a lack of proper supervision caused the alleged violation here or that the Town knew or should have known of a need to supervise Officer Slagen more closely, and no other ground to impose liability on the Town for Officer Slagen's allegedly unconstitutional use of force against plaintiffs on September 11, 2011. There is no other basis for *Monell* liability.

## CONCLUSION

Defendant has met its burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law. Plaintiffs have failed to come forward with evidence showing that there exists a genuine issue of material fact to be tried. Drawing all factual inferences in favor of plaintiffs and viewing all factual assertions in the light most favorable to them, the Court finds that the record taken as a whole could not lead a rational trier of fact to find for plaintiffs on any of their claims. Accordingly, the Court grants defendant's motion for summary judgment (Dkt. No. 22). All federal claims are dismissed with prejudice.

All state law claims are dismissed with prejudice, except that Sharif Mohamed's common-law malicious prosecution claim has not yet accrued and thus is dismissed without prejudice.

It is therefore

ORDERED that defendant's motion for summary judgment (Dkt. No. 22) is granted in all respects; and it is further

ORDERED that all claims are dismissed with prejudice except that Sharif Mohamed's common-law malicious prosecution claim is dismissed without prejudice; and it is further

ORDERED that the Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

Date:   June 20, 2016
        Syracuse, New York

**Norman A. Mordue**
**Senior U.S. District Judge**